**IN THE SUPREME COURT OF THE STATE OF IDAHO**
Docket No. 49155

| | | |
|---|---|---|
| **IDAHO STATE BAR,** | ) | |
| | ) | |
| **Petitioner-Respondent,** | ) | |
| | ) | |
| **v.** | ) | **Boise, June 2022 Term** |
| | ) | |
| **VERNON K. SMITH, JR.,** | ) | **Filed: July 15, 2022** |
| | ) | |
| **Respondent-Appellant.** | ) | **Melanie Gagnepain, Clerk** |
| | ) | |

Appeal from the Professional Conduct Board Hearing Committee of the Idaho State Bar, Ada County. Gary L. Cooper, Chair.

The Hearing Committee of the Professional Conduct Board of the Idaho State Bar's decision is <u>affirmed as amended</u>.

Vernon K. Smith, Jr., Attorney at Law, Boise, attorney for Appellant.

Bradley Andrews, Idaho State Bar, Boise, attorney for Respondent.

———————————————————

BEVAN, Chief Justice

This is an attorney discipline case. Vernon K. Smith, Jr., ("Smith") appeals the Findings of Fact, Conclusions of Law, and Recommendation of the Hearing Committee of the Professional Conduct Board of the Idaho State Bar ("the Committee"). The Committee recommended suspending Smith from the practice of law for two years and imposing a condition that Smith pass the Multistate Professional Responsibility Exam ("MPRE") before being reinstated. Smith argues the Committee's decisions are not supported by clear and convincing evidence and contends his family history and other mitigating factors show the recommendation and sanctions are inappropriate. Smith timely appealed to this Court. We affirm. However, we impose a sanction over and above that recommended by the Committee.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Course of Disciplinary Proceedings and Background

On September 2, 2020, the Idaho State Bar ("the Bar") filed a complaint against Smith alleging three counts of professional misconduct encompassing six Idaho Rules of Professional Conduct and requested Smith's suspension.

Count One alleged violations of multiple provisions of the Idaho Rules of Professional Conduct (I.R.P.C.): Rule 1.7(a)(2), engaging in a conflict of interest; Rule 2.1, failing to exercise independent professional judgment and render candid advice in representing a client; Rule 8.4(c), engaging in conduct involving dishonesty, fraud, deceit or misrepresentation; and Rule 8.4(d), engaging in conduct prejudicial to the administration of justice. Count Two alleged a violation of Rule 5.4(a), sharing legal fees with a nonlawyer, and Rule 5.4(d), practicing with or in the form of a professional corporation or association authorized to practice law for a profit where a nonlawyer owns an interest in it. Count Three also alleged Smith violated Rule 8.4 (c) and (d) by engaging in conduct involving dishonesty, fraud, deceit or misrepresentation, and by engaging in conduct prejudicial to the administration of justice.

Smith filed his answer on September 22, 2020. In December 2020, he moved to dismiss the complaint, which the Bar opposed. On January 15, 2021, the Committee held a hearing on Smith's motion and denied it. Following a series of dispositive motions from both parties, the case proceeded to a disciplinary hearing before the Committee on June 28 and 29, 2021. A disciplinary hearing was ultimately conducted by the Committee. The Committee made forty-nine findings of fact relevant to the three counts alleged against Smith.

On August 13, 2021, the Committee issued its Findings of Fact, Conclusions of Law, and Recommendation, recommending that Smith be suspended from the practice of law for two years. The Committee concluded the Bar had proved all three counts alleged in the complaint by clear and convincing evidence and recommended Smith be suspended from the practice of law for two years, with no reinstatement until after Smith took the MPRE and passed with a minimum scaled score of 85.

Smith moved to alter or amend the Committee's Findings of Fact, Conclusions of Law, and Recommendation, which the Committee denied. Smith timely filed his appeal to this Court.

1. *Facts related to Count One of the Complaint.*

Smith was the attorney for his mother, Victoria Smith. In 1976, Smith became the "exclusive attorney providing legal advice" to Victoria. According to Smith, he represented Victoria "as an attorney if and when she requested [his] assistance." This representation was

2

because he could "uniquely provide for, not only the financial needs of Victoria, but also her legal needs[.]" On February 14, 1990, about twenty-three years before she died, Victoria executed a holographic will that bequeathed all her assets to Smith and disinherited her two other children, Joseph Smith and Victoria (Vicky) Smith Converse. Smith was the only person with Victoria when she executed the will, and he served as the sole witness. Between 1997 and 2013, Smith acted as the attorney for Victoria in several legal matters.

The financial and legal relationship between Victoria and Smith was one of the matters Joseph testified to during the disciplinary hearing against Smith. In that disciplinary hearing, Joseph testified that he managed several pieces of Victoria's real property when Victoria signed the will in 1990. Joseph testified that when Victoria executed the will, he was not estranged from her. He first learned about the will several days after her funeral in September 2013. Based on this testimony, the Committee concluded there was "clear and convincing [evidence] that Joseph did not know that Victoria had executed a will or that he had been disinherited until after Victoria's death."

On July 15, 1999, nine years after she executed the holographic will, Victoria executed a durable power of attorney ("first POA"). She was 85 years old. The document named Smith as Victoria's attorney-in-fact and stated it would "endure the event of disability and death" of Victoria. Smith's legal assistant, Carolyn Puckett, notarized the document. Smith testified he prepared the first POA at Victoria's request because she wanted him to "have a power of attorney to do whatever [he] wanted to do with [her] properties." Smith waited until October 6, 2014— three days after Joseph commenced probate proceedings of Victoria's estate, to record the first POA.

On April 11, 2008, Victoria, then 94 years old, executed a second power of attorney ("second POA"). The second POA also named Smith as Victoria's attorney-in-fact, and it listed his authority as "unconditional, unlimited and all inclusive" as to her affairs and legal rights, including over her real property. John Gibson, Smith's legal receptionist, notarized the second POA. The second POA also provided:

> This Durable Power of Attorney is irrevocable and shall remain in full force and effect, having been coupled with adequate consideration, and shall not be affected, altered or impaired by the event of my death or disability, and shall continue in effect for all time, as it has been my long-standing intention and desire that my son, Vernon K. Smith Jr., shall be the sole and exclusive heir of my entire estate, as I

3

have so declared openly in the past many years, because of his commitment, dedication, and devotion to my best interests, welfare, and financial well being.

The next year, Smith married his second wife, Vicki. On May 1, 2009, Smith drafted and executed a post-nuptial personal property ownership agreement. This agreement assigned and transferred all Smith's separate personal property interests to Vicki and relinquished his rights to claim any community property interests obtained after April 19, 2009. When Smith executed the agreement, he had several creditors; Vicki testified she had none.

Several years later, on July 3, 2012, Smith formed VHS Properties, LLC, and listed himself and Victoria as members. When Smith formed VHS, Victoria was 99 years old. The next day, Smith drafted and executed a document ("transfer document") that transferred Victoria's real and personal property to VHS for $10 consideration and other "good and valuable lawful consideration." Smith executed the transfer document "pursuant to his exclusive Durable, and Irrevocable Power of Attorney" purportedly on Victoria's behalf. The document stated, in part:

> WHEREAS: Victoria H. Smith had before executed her Last Will and Testament on February 14, 1990, designating therein her son, Vernon, to her sole and exclusive Heir, having done so through the formation of her Holographic Will, written by [sic] her own stationary, in her own handwriting, signed and dated by her, being done deliberately in that fashion to emphatically to [sic] convey her intentions, and to avoid any appearance of any influence by anyone having chosen to do so in accordance with the way in which her husband, Vernon K. Smith, Sr., a well-known attorney in Boise, Idaho, had so executed his Last Will and Testament by such holographic means, by which Victoria H. Smith acquired his entire inheritance to the exclusion of anyone else; and,

> WHEREAS: Vernon has always been the sole source of all management, maintenance, financial means, operation and control of all assets of Victoria H. Smith, beginning after his Father's death, and especially since and after his becoming an Attorney in 1971, having at all times thereafter dedicated his life to the preservation of Victoria's assets and providing for her living need[s] and satisfaction of any obligation . . . .

Royal Von Puckett—Smith's friend and client who secured a judgment against Smith's ex-wife and later assigned it to Smith—notarized the signatures on the transfer document, transferring Victoria's property. *See Puckett v. Bergmann*, 167 Idaho 403, 470 P.3d 1212 (2020). The transfer document claimed Smith had always been the sole source of management for Victoria's assets, but during the disciplinary hearing, Joseph disagreed and testified that he was also involved in the management of Victoria's assets. The Committee concluded Smith "exaggerated his exclusive role as manager of Victoria's properties and business enterprises prior to 1992."

Along with transferring Victoria's real and personal property, Smith also drafted and executed a document on Victoria's behalf transferring and assigning Victoria's interest in VHS to himself on July 4, 2012, using the second POA. Von Puckett also notarized Smith's signature on that document. Later the same day, Smith prepared six quitclaim deeds reflecting his transfer of Victoria's real property to VHS. The deeds transferred property known as "the Chinden Property," "the Gowen Property," "the Hamer Property," a two-story office complex holding Smith's law office on Main Street, a property located at 1807 W. Idaho Street, and "the Raymond Property."[1] The transfer encompassed close to two thousand acres of property and was worth roughly 30 to 37 million dollars, although Smith disputed the estimated value of the properties in the proceedings below. Following these transfers, Smith exercised sole ownership over all of Victoria's assets

Smith testified the value of the properties was less than 2 million dollars when he transferred the properties on July 4, 2012. Joseph introduced evidence in the probate case advocating the property was worth 27 million dollars. The Committee concluded "many of the transactions involving Victoria's property and [Smith's] law practice were performed to prevent [Smith's] ex-wife from satisfying a judgment she acquired against [him] in their divorce proceedings."

The magistrate judge in the probate case concluded the consideration Smith gave in exchange for Victoria's assets was "so disproportionate as to suggest fraud." The magistrate court also found that $10 in consideration for transferring assets worth between 1 and 27 million dollars was "so inadequate as to shock the conscience" and a "sham" intended to disguise "a gift." After Smith appealed the magistrate's decision to the district court and then this Court, we affirmed the magistrate's decision and concluded the magistrate court correctly invalidated the transfers. *See Matter of Est. of Smith*, 164 Idaho 457, 463, 432 P.3d 6, 12 (2018).

During his disciplinary hearing, Smith testified he transferred Victoria's interest to VHS Properties, LLC, and then to himself to "preserve and protect" the properties. But he acknowledged that at the time of the transfers, Victoria had no creditors—only he did. The transfers protected Smith's assets from his creditors, mainly his ex-wife.

---

[1] Smith's refusal to vacate the Raymond Property was at issue in *Elsaesser v. Gibson*, 168 Idaho 585, 484 P.3d 585 (2021). The Gowen Property was also on appeal before this Court in *Elsaesser v. Black Diamond*, 2022 WL 2541729 (2022), and the Chinden Property was at issue in *Elsaesser v. Riverside Farms, Inc.*, 2022 WL 2444697 (2022).

Smith also acknowledged he did not recommend Victoria consult independent counsel for her property transfers or any of the estate planning. He likewise never informed Victoria that when she executed the transfers, all the property, including his membership interest in VHS Properties, LLC, had been transferred to his new wife Vicki pursuant to a post-nuptial agreement. As for the 2012 transfers, Smith testified during the probate trial that Victoria wanted him to have her entire estate and he "chose to take it by deed transfer as opposed to testamentary disposition." The Committee concluded that Victoria was competent to decide whether to transfer her assets to an LLC but that she "was not offered the opportunity to execute the documents" transferring those assets. The Committee also concluded that Smith did not discuss the transfers with Victoria and instead used the second POA to transfer her assets to his control to "protect her assets." According to the Committee:

> The only threats to Smith's inheritance were to Smith from his ex-wife who had a judgment against him and from his siblings who had been disinherited through the efforts of Smith. Thus, Smith acted to protect himself and his financial interests when he used the Second POA to transfer Victoria's assets to VHS and Victoria's interest in VHS to himself. On April 30, 2015, Smith transferred his interest in VHS to his wife, Victoria L. Smith, to obstruct efforts by Joseph to obtain a share of the inheritance and to prevent his ex-wife from satisfying her judgment against Smith.

Victoria died on September 11, 2013. Joseph petitioned for formal adjudication of intestacy and formal appointment of personal representative on October 3, 2014, alleging her holographic will was the result of undue influence. Joseph asked the court to determine that the will was invalid and find that Victoria died intestate. Three days later, Smith recorded the first and second POAs. On October 6, 2014, Smith also recorded the July 6, 2012, deeds that transferred Victoria's real property to VHS.

On September 6, 2018, Smith filed for Chapter 11 bankruptcy. He testified that he filed for bankruptcy because his ex-wife was trying to satisfy a judgment against him. The bankruptcy court dismissed Smith's bankruptcy petition in an oral ruling on September 11, 2019, explaining that Smith had "displayed a steadfast dedication to protecting his own interests." The bankruptcy court also explained in that ruling:

> I disagree with Vernon's explanations that his conduct was appropriate in protecting [Victoria's] interests. These actions all seem to be most directly aimed at promoting his own interests.

> By virtue of that power of attorney and under that will, basically all of the family assets were diverted from other members of the family to Vernon Smith. There is

6

no doubt that he . . . devoted a considerable amount of time and effort and resources to the support and care of his elderly mother but when I look at the extent of the assets involved and the amount of money implicated that he would end up being the beneficial owner of all of the assets, all of -- all of those funds, that far outweighs any consideration that he gave in return. The power of attorney and the will and his conduct in connection with the transactions undertaken thereby are a real concern to this judge.

. . .

Mr. Smith has also entered into other transactions which give the Court great cause for concern. For example, he is a party along with his current wife to a so-called post-nuptial agreement that to me strains credulity that it has any other purpose in mind other than to strictly and solely hinder, delay and prevent his creditors from getting access to any of his assets and property.

The post-nuptial agreement purports to transmute all of his current and future community property holdings and arguably his separate property to his wife's ownership. Why? He says there are legitimate reasons for it. I simply disagree that the proof demonstrates the legitimacy of those reasons. I think it was an asset protection tool.

The agreement is vaguely written and over the years, Mr. Smith has invoked it to protect his interests on a selective basis. In other words, when it's convenient, he owns and manages his assets. When it's not convenient, the assets are owned and managed by his spouse under this agreement and thereby allegedly immune from seizure by his creditors.

From this, the Committee concluded Smith violated I.R.P.C. 1.7(a)(2)[2], 2.1[3], 8.4(c)[4], and 8.4(d)[5].

### 2. *Facts related to Count Two of the Complaint.*

On January 8, 2016, Smith filed a certificate of organization for a limited liability company, creating the "law office of Vernon K. Smith, LLC." Smith identified himself and his wife, Vicki, as the "governors" of the LLC. Smith and Vicki signed the certificate of organization as the organizers of the LLC. Vicki signed and filed the annual reports for the LLC during the reporting years 2017, 2018, and 2019, and identified herself as a member of the LLC.

Smith testified during the disciplinary hearing that he gave Vicki a 90 percent interest in the law firm and he "retained ten percent to show a right to use" the office. Smith testified that

---

[2] I.R.P.C. 1.7(a) (conflict of interest: current clients).

[3] I.R.P.C. 2.1 (exercising independent professional judgment and candid advice).

[4] I.R.P.C. 8.4 (c) (engaging in conduct involving dishonesty, fraud, deceit or misrepresentation).

[5] I.R.P.C. 8.4 (d) (engaging in conduct prejudicial to the administration of justice).

7

from January 8, 2016, until March 11, 2019, Vicki received all the income from the LLC. Smith also admitted Vicki received all the income from the law firm while under oath at a bankruptcy proceeding (a 341 meeting of creditors). He also testified that his law firm's LLC earnings were earned from the practice of law and from client fees.

Around March 11, 2019, after questions arose in Smith's bankruptcy case about his law firm, Smith converted the firm from an LLC to a PC and became its sole member. Following this maneuver, on September 11, 2019, the United States Bankruptcy Judge entered an oral ruling dismissing Smith's bankruptcy petition:

> Respondent entered into an arrangement whereby he effectively agreed to practice law for his wife as an employee. His wife is a non-lawyer. Fundamental first year law school instruction would suggest that there are ethical problems with a lawyer who agrees to be subject to the control of a non-lawyer in connection with the practice of law.

> That arrangement whereby he effectively draws a modest salary or draw from his law practice as opposed to benefiting from the full income of that practice under the terms of that agreement was, at best, poor judgment. At worst, unethical. And it looks like he engaged in that practice for years. He has recently revised his approach in terms of the formalities as to how he practices law and established a new entity. I think it was a professional LLP to do that but he did so begrudgingly and he did so only after the details of the prior arrangement have been aired and [the Personal Representative of Victoria's Estate] exhibited his interest in maybe following up on pointing out the impropriety of all of that.

It was not until January 20, 2021, that Smith filed a statement of conversion with the Idaho Secretary of State, converting the law office LLC to a Professional Services Corporation. The Committee found Smith used his firm "to practice law with his non-lawyer wife who was a member-owner and with whom he shared legal fees." The Committee also concluded that Vicki was a 90 percent owner of the LLC, despite not being a lawyer, with Smith owning only 10 percent. As a result, the Committee determined Smith violated I.R.P.C. 5.4(a)[6] and 5.4(d).[7]

**3.** *Facts related to Count Three of the Complaint.*

On October 12, 2018, Smith testified during a meeting of creditors noted above that he had not filed his 2006 through 2018 tax returns. During his disciplinary hearing, Smith acknowledged

---

[6] I.R.P.C. 5.4 (a) (sharing fees with a nonlawyer).

[7] I.R.P.C. 5.4 (d) (practicing with or in the form of a professional corporation or association authorized to practice law for a profit where a nonlawyer owns an interest in it).

that he had testified during a bankruptcy meeting of creditors to not filing the tax returns—but Smith claimed he "was justified in what [he] did."

The bankruptcy judge addressed Smith's failure to file his tax returns in his oral ruling:

> Respondent has displayed what I will suggest is at best a cavalier attitude, at worst, a neglectful attitude about filing tax returns. First of all, until fairly recently, it looks like he was less than prudent, less than diligent in filing his personal tax returns. To the extent that's been corrected, that's been a fairly recent development. It's not been a matter of lack of funds or resources he's not been able to do so. He's had other explanations for failure to be timely on his tax filings. I find those to be unpersuasive.

In his disciplinary hearing, Smith testified it was his decision not to file his tax returns. He testified that because of embezzlement in his office, "he held off filing the returns. Figuring no harm, no foul." Smith's employee who embezzled the money was charged and convicted in January 2009. The employee was ordered to pay restitution in July 2009. Despite that order, Smith did not file his tax returns until November 2020—after the bar complaint was filed.

According to a letter Smith submitted to the Committee, his state and federal taxes for 2016, 2017, and 2018 were filed and he requested an extension for the 2019 tax year. The Committee concluded Smith did not file any state or federal tax returns for the 2006-2015 tax years until two months after the Bar filed its disciplinary complaint. The Committee found that Smith's "attempts to excuse his untimely filing of state and federal tax returns" based on an employee's embezzlement and farming operations losses were "not persuasive." The Committee also concluded that although a restitution order was entered in the embezzlement case in 2009, Smith did not file his returns until 2020. The Committee noted that "losses due to farming operations are not so unique that it would justify the significant delay in filing tax returns shown in this case."

The Committee concluded Smith violated I.R.P.C. 8.4(c) and 8.4(d).

## II. STANDARD OF REVIEW

When this Court reviews an attorney discipline action, it "independently examines the record developed before the Professional Conduct Board to determine whether the evidence supports the findings and recommendations of the Board's hearing committee." *Idaho State Bar v. Warrick*, 137 Idaho 86, 90, 44 P.3d 1141, 1145 (2002). *See also Idaho State Bar v. Souza*, 142 Idaho 502, 505, 129 P.3d 1251, 1254 (2006). The Court examines the hearing committee's decision "to determine if it is clearly erroneous or arbitrary and capricious." *Warrick*, 137 Idaho at 90, 44 P.3d at 1145. The hearing committee's findings are entitled to great weight. *Id*. The professional

misconduct must be proven by clear and convincing evidence. *Wilhelm v. Idaho State Bar*, 140 Idaho 30, 34, 89 P.3d 870, 874 (2003). Yet the disciplined attorney bears the burden of showing that the evidence does not support the hearing committee's findings. *Idaho State Bar v. Malmin*, 139 Idaho 304, 307, 78 P.3d 371, 374 (2003).

### III. ANALYSIS

While this Court independently examines the record to decide whether the evidence supports the Committee's recommendation, we note at the outset that Smith is barred under the principles of issue preclusion from challenging the factual basis underlying most counts of the complaint.

> Five factors are required in order for issue preclusion to bar the relitigation of an issue determined in a prior proceeding: (1) the party against whom the earlier decision was asserted had a full and fair opportunity to litigate the issue decided in the earlier case; (2) the issue decided in the prior litigation was identical to the issue presented in the present action; (3) the issue sought to be precluded was actually decided in the prior litigation; (4) there was a final judgment on the merits in the prior litigation; and (5) the party against whom the issue is asserted was a party or in privity with a party to the litigation.

*Ticor Title Co. v. Stanion*, 144 Idaho 119, 124, 157 P.3d 613, 618 (2007) (citing *Rodriguez v. Dep't of Correction*, 136 Idaho 90, 93, 29 P.3d 401, 404 (2001)).

Here, many of the facts that Smith contests have been the subject of past litigation and appeals, all of which were decided against Smith. For example, the following facts have been adjudicated and determined to be true: (1) Victoria's holographic will resulted from undue influence, (2) the first power of attorney did not authorize the transfer of real property; and (3) second power of attorney terminated on Victoria's death. These matters were all decided in prior litigation before this Court. Smith was a party to those proceedings, and in some cases, has tried to argue the merits before this Court repeatedly. But in each of these cases, he has had a full and fair opportunity for the issues to be decided, and a final judgment on the merits was issued in those cases. *See Matter of Estate of Smith*, 164 Idaho 457, 464, 432 P.3d 6, 13 (2018) (holding Victoria's power of attorney did not authorize transfer of real property, and the record contained sufficient evidence to support finding that holographic will resulted from Smith's undue influence); *Smith by & through Smith v. Treasure Valley Seed Co., LLC*, 161 Idaho 107, 109, 383 P.3d 1277, 1279 (2016) ("*Smith I*") (Vernon's power of attorney terminated at Victoria's death); *Smith By & Through Smith v. Treasure Valley Seed Co., LLC*, 164 Idaho 654, 657, 434 P.3d 1260, 1263 (2019)

10

("*Smith II*") ("Of the three issues presented in his opening brief, all three involve at least a partial attempt to relitigate the prior determination of this Court regarding "the irrevocable power of attorney.").

As a result, to the extent the complaint against Smith now on appeal involves a challenge to these issues, Smith is bound by this Court's prior holdings. *Ticor Title Co.*, 144 Idaho at 124, 157 P.3d at 618.

**A.** **The Committee's conclusion that Smith violated I.R.P.C. 1.7(a)(2), 2.1, 8.4(c), and 8.4(d) was not clearly erroneous or arbitrary and capricious.**

Count One of the complaint alleged Smith violated I.R.P.C. 1.7(a)(2), 2.1, 8.4(c) and 8.4(d). Smith first challenges this count by arguing no testimony was put forth at the hearing to show he performed in a manner inconsistent with Victoria's wishes, desires, or best interests. I.R.P.C. 1.7(a)(2)

The Committee concluded there was clear and convincing evidence Smith's involvement with Victoria's holographic will, the first and second POAs, and the 2012 property transfers violated I.R.P.C. 1.7(a)(2). In reaching this conclusion, the Committee explained:

> At no time between 1971 and Victoria's death in 2013 did she give informed consent, confirmed in writing, in connection with the legal advice and direction she received from Smith, or in connection with her execution of the First POA and Second POA prepared for her by Smith, or in connection with the self-dealing legal transactions by which Smith transferred Victoria's assets to VHS which Smith performed using the Second POA.

> Under I.R.P.C. 1.7(a)(2):

> . . .

> Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

> . . .

> (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by the personal interests of the lawyer, including family and domestic relationships.

I.R.P.C. 1.7(a)(2). The exception provided in paragraph (b) explains that an attorney may undertake a representation despite a concurrent conflict of interest, including a conflict based on the attorney's personal interests, if the attorney complies with certain conditions, such as obtaining informed consent. *See* I.R.P.C. 1.7(b).

11

The allegation that Smith violated this rule stems from three separate incidents: (1) his involvement with Victoria when she drafted her holographic will in 1990; (2) his connection to the execution of Victoria's first and second powers of attorney; and (3) using the second power of attorney to transfer Victoria's assets to VHS, LLC in 2012. We will address each in turn.

   a. *The 1990 holographic will*

Smith first argues there was no risk of a conflict of interest in advising Victoria on drafting her will because she wanted him involved. Smith maintains he was a loyal son and contributed legal services when Victoria requested. Smith asserts the Bar failed to show undue influence or a conflict of interest related to the will.

As discussed above, we will not entertain an argument that the will was not the product of undue influence. This issue was soundly decided against Smith in *Matter of Est. of Smith*, 164 Idaho at 463, 432 P.3d at 12. Thus, the only question is whether the record supports the Committee's findings that Smith failed to obtain informed consent, confirmed in writing prior to undertaking representation of Victoria before he witnessed the execution of her will. We hold it does.

The Committee concluded Smith had a concurrent conflict of interest "when he became aware of the terms of Victoria's 1990 holographic will and witnessed her execution of the same." The Committee also found that based "on the extent and size of Victoria's estate, it was particularly incumbent on [Smith] to obtain informed consent, confirmed in writing, before witnessing the executing" of her will. The Committee determined there was no evidence to suggest Victoria gave informed consent, confirmed in writing, about the legal advice she received from Smith in connection with the execution of her 1990 holographic will. Even more, the Committee concluded:

> Such informed consent would have required Smith to disclose his conflict of interest and would have required Smith to communicate adequate information and explanation about the material risks of and reasonably available alternatives to Victoria's proposed course of conduct to disinherit Smith's two siblings and leave the entirety of her considerable estate to Smith. This obligation was particularly required in this case because Smith had actively engaged in conduct to isolate Victoria from and alienate her affections from his siblings, particularly Joseph Smith. Smith violated IRPC 1.7(a)(2) when he helped facilitate his mother's preparation and/or execution of a holographic will which disinherited his siblings and left all of his mother's considerable estate to himself in 1990 without obtaining informed consent, confirmed in writing.

12

Smith responds by challenging the concept that there could ever be a lack of informed consent between a parent and a child, proposing that the fifty-year relationship between he and Victoria was adequate informed consent. Smith's efforts to recast his professional responsibility to inform Victoria of her available options and the potential risks of her estate plan, in writing, as an attempt to undermine the parent-child relationship shows his inability to appreciate the seriousness of his actions.

I.R.P.C. 1.7, cmt. 20, explains why it is so important that a lawyer obtain informed consent, confirmed in writing, when a conflict of interest is present:

> Paragraph (b) requires the lawyer to obtain the informed consent of the client, confirmed in writing. Such a writing may consist of a document executed by the client or one that the lawyer promptly records and transmits to the client following an oral consent. . . The requirement of a writing does not supplant the need in most cases for the lawyer to talk with the client, to explain the risks and advantages, if any, of representation burdened with a conflict of interest, as well as reasonably available alternatives, and to afford the client a reasonable opportunity to consider the risks and alternatives and to raise questions and concerns. *Rather, the writing is required in order to impress upon clients the seriousness of the decision the client is being asked to make* and to avoid disputes or ambiguities that might later occur in the absence of a writing.

I.R.P.C. 1.7 cmt. 20 (emphasis added).

On appeal, Smith overlooks or misapprehends why his involvement in preparing Victoria's will without receiving her informed consent was troublesome. There is no indication from the documents in the record that Smith ever advised Victoria to seek the advice of independent counsel in drafting the document or that he provided her other alternatives for her estate. Indeed, the Committee found clear and convincing evidence that Smith "had actively engaged in conduct to isolate Victoria from and alienate her affections from his siblings, particularly Joseph Smith," and that he facilitated Victoria's writing the holographic will that disinherited his siblings.

In the probate proceedings following Victoria's death, Smith admitted to discussing the contents of Victoria's will with her before she executed it. The probate court determined that "Victoria prepared her will with Vernon's advice and . . . Victoria had long-standing trust in and reliance upon Vernon." *Matter of Est. of Smith*, 164 Idaho at 476, 423 P.3d at 25. The probate court determined the holographic will was unnatural, unjust, irrational, and a result of Smith's undue influence. *Id.* at 478, 423 P.3d at 27. We have previously affirmed this conclusion. *Id*. It should be obvious to even a non-lawyer that a lawyer assisting his mother in drafting a will that

13

bequeaths her estate to him and disinherits her other children is the epitome of a conflict of interest. Smith's behavior is precisely the action the Rules of Professional Conduct are meant to and do expressly prohibit.

As a result, the record establishes by clear and convincing evidence, the Committee's conclusions that Smith violated I.R.P.C. 1.7(a)(2) on the holographic will.

### b. *The first and second POAs*

Most of Smith's references to the powers of attorney are in the statement of facts in his brief; he makes only cursory reference to either document as part of his argument, and no reference that includes a citation to the record. Much like the arguments put forth to support his mother's holographic will, Smith argues his involvement with the powers of attorney resulted in no conflict of interest because the documents were what Victoria and her bank wanted and were to remain in effect after her death.

Smith claims Victoria signed the first POA because she was scheduled for gall bladder surgery, and she requested Smith prepare the POA with her, which she read, signed, and acknowledged in front of a notary. Smith fails to mention the notary was Carolyn Puckett, his legal secretary. Nine years later, Victoria signed the second POA following a fall in 2008. Smith claims that because of the fall Victoria experienced, she was advised not to travel, and Victoria's bank told Smith it needed a current POA—prompting him to obtain the second POA. This POA was notarized by John Gibson—Smith's legal receptionist. Smith asserts his authority under the second POA reconfirmed his initial authority and "expanded upon what the bank wanted, an irrevocable power…with language Victoria wanted and the bank needed to allow the use of the account in the manner intended and approved by the Bank, —for use posthumously."

As with the will, Smith has repeatedly tried to relitigate his claim that the POA did not terminate on Victoria's death. *See Smith I* ("Vernon's power of attorney, therefore, terminated at Victoria's death"); *Smith II* ("Of the three issues presented in his opening brief, all three involve at least a partial attempt to relitigate the prior determination of this Court regarding 'the irrevocable power of attorney.'"). Consequently, as this Court has repeatedly explained, the holding that the power of attorney terminated on Victoria's death is "the law of the case." *Smith II*, 164 Idaho at 658, 434 P.3d at 1264. *See* RESTATEMENT (THIRD) OF AGENCY § 3.07 (2006) ("The principal's death terminates the actual authority of an agent whom the principal has appointed pursuant to a durable power of attorney.").

Inasmuch as we have held that the POA terminated on Victoria's death, Smith is precluded from arguing otherwise. So, we turn to whether Smith violated Rule 1.7(a) for failing to obtain Victoria's informed consent, confirmed in writing, when he aided her in executing the POA's. The Committee found Smith did not obtain Victoria's informed consent, confirmed in writing, before drafting either POA. The Committee concluded:

> This obligation was particularly required in this case because of the broad and extensive powers granted to Smith by the POA's [sic]. Due to the size and extent of Victoria's estate, Smith was obligated to advise Victoria that the First and Second POA's [sic] empowered him to transfer Victoria's entire estate to him without notice to her and this disclosure should have been confirmed in writing to comply with IRPC 1.7(a)(2). Smith violated IRPC 1.7(a)(2) when he prepared and counseled Victoria to execute the First and Second Powers of Attorney naming himself as his mother's attorney-in-fact without obtaining informed consent, confirmed in writing.

Smith puts forth no argument to challenge the Committee's conclusion that he failed to obtain Victoria's informed consent, confirmed in writing. He merely asserts the content of both POAs were what Victoria wanted. Thus, he failed to carry his burden of showing the evidence did not support the Committee's findings. *See Idaho State Bar v. Malmin*, 139 Idaho 304, 307, 78 P.3d 371, 374 (2003). As a result, we affirm the Committee's conclusion.

### c. VHS Properties, LLC, and the July 2012 transfers

The last incident giving rise to the charge Smith violated Rule 1.7(a) stems from transferring Victoria's real property to an entity Smith created—VHS Properties, LLC. The Bar alleges Smith created VHS Properties, LLC, on behalf of Victoria, acting in his capacity as her attorney. The next day, Smith used the second POA to transfer Victoria's property to the LLC and then to himself. The Bar claims Smith made these transfers to obtain Victoria's assets as an apparent "gift" during her lifetime to avoid a future probate challenge from Joseph after her death. The Bar also argues that Smith's representation of Victoria related to the control and transfer of her assets to himself. The scope of Smith's representation was materially limited by his own personal interest in placing the assets into VHS Properties, LLC, for his own benefit, including making himself the sole beneficiary of Victoria's estate and to avoid paying taxes as a beneficiary under the will. Smith argues Victoria directed him to transfer properties to VHS. He claims that Victoria's interest in the properties—to protect, preserve, and improve their value—was also his interest.

15

This claim involves six separate properties: (1) Chinden Property; (2) Gowen Property; (3) Hamer Property; (4) Main Street office complex; (5) Idaho Street residential property; and (6) the Raymond Street Property. The factual findings related to these transfers are particularly troubling because they illustrate a concerted effort by Smith to transfer all of Victoria's assets for his own benefit, evade taxes, avoid probate, and circumvent legal proceedings with his ex-wife with little regard for Victoria's financial interest or his professional responsibilities as an attorney.

From the record below, the Committee concluded that Smith used the second POA to transfer Victoria's personal and real property to VHS on July 4, 2012, for $10.00 consideration. The value of the transfer was estimated at twenty-seven million dollars. Despite executing the deeds in 2012, Smith did not record the deeds until October 2014—after his brother started probate proceedings. Smith claimed he forgot to record the deeds, but the Committee found, and we agree, the more probable explanation of why he failed to record the deeds was that he "intended to hide the transactions" from his ex-wife and siblings.[8]

The Committee concluded Smith did not discuss or explain the transfers to Victoria or her interests in VHS. In reality, despite Smith's contention he used the second POA to transfer her assets to "protect her assets," Victoria had no creditors when Smith executed the transfer. As for the importance of obtaining Victoria's informed consent as to the 2012 transfer, the Committee concluded:

> This obligation was particularly required in the circumstances of the 2012 transfers of Victoria's interests in her property because Victoria was competent and, by Smith's own admission, could have accomplished these transfers herself by executing the transfer documents and deeds in her own name. However, Smith chose to use the Second POA, and possibly the First POA, to accomplish these transfers and did not record the evidence of the transfers until after Victoria's death for the purpose of preventing detection. The Hearing Committee concluded by clear and convincing evidence that Smith did not discuss and explain the nature and consequences of the July 2012 transactions with Victoria before executing the documents on July 4, 2012. [Vernon] Smith violated IRPC 1.7(a)(2) when he formed VHS with his mother using the Second POA, transferred all of her property into VHS and then transferred her interest in VHS to himself the same day in 2012 without obtaining informed consent, confirmed in writing.

---

[8] *See Smith v. Smith*, 136 Idaho 120, 122, 29 P.3d 956, 958 (Ct. App. 2001) (citing the district court's discussion of Smith's longstanding efforts to "artfully dodge" judgments against him).

16

On appeal, Smith claims Victoria wanted "no involvement with attorneys beyond her son who gave legal services she requested without cost." Smith once again fails to appreciate why the lack of informed consent is significant; instead, he suggests that the requirement for him to do so "reflects 'form' over 'substance', and nothing different would be the result." Whether Victoria ultimately would have selected Smith to represent her is not the issue. Informed consent required Smith to explain why representing Victoria posed a conflict of interest and facilitate a conversation about the risks and alternatives available for her estate and financial choices. Smith never gave Victoria these options, which is particularly unprincipled given the obvious benefits he obtained by his violation of the Rules of Professional Conduct.

The basis of the allegation against Smith under Count One was his failure to obtain Victoria's informed consent. Because he does not challenge the Committee's conclusion that he did not obtain informed consent in violation of I.R.P.C. 1.7(a) when he assisted Victoria with the holographic will, the first or second POA, or the transfers, we hold the Committee's conclusions were based on clear and convincing evidence and supported by unrebutted substantial and competent evidence.

### 2. I.R.P.C. 2.1

Under Count One of the complaint the Bar also alleged Smith violated Rule 2.1. The conduct underlying this allegation also stemmed from Smith's actions with Victoria's will, the first and second POA, and the 2012 property transfers. Under I.R.P.C. 2.1:

> In representing a client, a lawyer shall exercise independent professional judgment and render candid advice. In rendering advice, a lawyer may refer not only to law but to other considerations such as moral, economic, social and political factors, that may be relevant to the client's situation.

I.R.P.C. 2.1.

Despite setting out a violation of Rule 2.1 as one of the issues Smith intended to challenge on appeal, he failed to reference the rule in his opening brief and put forth no argument on appeal to challenge the Committee's conclusion that he violated it. He filed no reply brief.

This Court will not consider an issue not "'supported by argument and authority in the opening brief.'" *Bach v. Bagley*, 148 Idaho 784, 790, 229 P.3d 1146, 1152 (2010) (quoting *Jorgensen v. Coppedge*, 145 Idaho 524, 528, 181 P.3d 450, 454 (2008); *see also* I.A.R. 35(a)(6) ("The argument shall contain the contentions of the appellant with respect to the issues presented

17

on appeal, the reasons therefor, with citations to the authorities, statutes and parts of the transcript and record relied upon.").

Thus, because Smith failed to support this issue with argument, we hold the Committee's conclusion that Smith violated I.R.P.C. 2.1 was based on clear and convincing evidence, and was not clearly erroneous, or arbitrary and capricious.

### 3. *I.R.P.C. 8.4(c) and 8.4(d)*

Last, under Count One, the Bar alleges Smith's attorney-client relationship with Victoria and his actions with her will, first and second POA, and the 2012 transfers violated I.R.P.C. 8.4(c) and 8.4(d). As with the allegation that Smith violated Rule 2.1, Smith puts forth no cogent legal argument or authority to challenge the Committee's conclusion that he violated Rules 8.4(c) and (d). Instead, Smith merely challenges the Bar's assertion and the Committee's conclusion that he violated 8.4(c) and 8.4(d) by claiming that the only act prejudicial to justice has been "Joseph's efforts to undermine and destroy the intentions of their [m]other, defaming and defying her intentions, and once again—stealing from his brother." Smith claims the Committee cannot show his actions were prejudicial to the administration of justice without first establishing a conflict of interest, which he denies. Smith also claims his sister Vicky's emails "confirm no dishonest, deceitful, fraudulent or wrongful act was ever undertaken to alter the long-held intentions of Victoria[.]"

Once again, this Court will not consider an issue not "'supported by argument and authority in the opening brief.'" *Bagley*, 148 Idaho at 790, 229 P.3d at 1152 (quoting *Jorgensen*, 145 Idaho at 528, 181 P.3d at 454); *see also* Idaho App. R. 35(a)(6) ("The argument shall contain the contentions of the appellant with respect to the issues presented on appeal, the reasons therefor, with citations to the authorities, statutes and parts of the transcript and record relied upon.").

Under I.R.P.C. 8.4:

It is professional misconduct for a lawyer to:

…

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(d) engage in conduct that is prejudicial to the administration of justice;

I.R.P.C. 8.4(c)–(d).

The record shows Smith abused his attorney-client relationship with Victoria by failing to advise her of the consequences of the estate planning decisions she was making—decisions Smith

18

stood to directly benefit from. Smith failed to advise Victoria about why he wanted to form VHS or explain that he was using the power of attorney he drafted to transfer *her* property to *himself* through the LLC. Smith used his access to these assets to avoid his own creditors. He also misused his role as Victoria's attorney to avoid probate, estate taxes, and his own creditors. He did this without the knowledge of other family members or anyone who might challenge the transfers or object to his misdeeds during Victoria's life. And while he likely did this without Victoria's knowledge, he certainly did it without her informed consent.

The Committee's conclusion sums-up the issues in Count One, while intertwining the allegations from the other two counts:

> Smith engaged in a pattern of self-dealing conduct while engaged in the practice of law beginning as early as 1976 and continuing to the present which involved dishonesty, fraud, deceit or misrepresentation by acting in his own best interest while ignoring the fiduciary duty he owed to his mother which has interfered with the administration of justice. Such conduct involves the following: (1) exercised undue influence over his mother to benefit himself financially; (2) engaged in effort to isolate his mother and alienate her affections away from Smith's siblings for the purpose of benefiting himself financially; (3) ignored the Rules of Professional Conduct in connection with advising, or failing to advise, his mother about the probably [sic] future consequences of a holographic will which disinherited his siblings and benefitted himself financially; (4) ignored the Rules of Professional Conduct in connection with fully informing his mother about the consequences of executing powers of attorney which he used to transfer all of her considerable assets prior to her death to himself; (5) ignored the Rules of Professional Conduct by failing to explain to explain [sic] the purpose of forming a business entity with his mother; (6) ignored the Rules of Professional Conduct by failing to inform his mother that he was transferring her assets to himself before her death; (7) created a business entity with his nonlawyer wife for the purpose of practicing law and sharing profits from the practice of law in violation of clear Rules of Professional Conduct prohibiting such conduct; (8) acted in his own best interest in transactions, rather than in the best interest of his mother, while acting as a fiduciary and lawyer to his mother; and (9) engaged in expensive probate/estate litigation with his brother over the validity of his actions which involved the invalid transfer of the entirety of their mother's estate to himself to the exclusion of his brother and his sister. Much of the conduct cited above was perpetrated over a long period of time and involved a continuous pattern of conduct over forty years of Smith's practice of law in Idaho as an Idaho licensed attorney the conduct involved the practice of the law, including the improper organization of his office with a non-lawyer, the willful failure to report his income by timely filing tax returns and the breach of fiduciary obligations he owed to his mother who was his most important client. Smith's conduct amounts to professional misconduct prohibited by IRPC 8.4(c) and (d).

19

As the Committee explained, Smith's conduct has involved a long pattern of dishonesty, fraud, deceit, and misrepresentation. Smith has failed to carry his burden on appeal to show the evidence does not support the Committee's findings. The record sufficiently establishes Smith's violations of I.R.P.C. 8.4(c) and (d), and the Committee's conclusions were supported by clear and convincing evidence, were not clearly erroneous, or arbitrary and capricious. We affirm the Committee's conclusions.

**B.      The Committee's conclusion that Smith violated I.R.P.C. 5.4(a) and 5.4(d) was not clearly erroneous or arbitrary and capricious.**

Count Two of the complaint alleged Smith violated I.R.P.C. 5.4(a) by sharing legal fees with his wife, Vicki. The complaint also alleged Smith violated I.R.P.C. 5.4(d) by permitting Vicki to hold a 90 percent ownership interest in the law firm LLC.

Under I.R.P.C. 5.4(a), a lawyer is prohibited from sharing legal fees with a nonlawyer except in certain cases. I.R.P.C. 5.4(d) also provides:

> A lawyer shall not practice with or in the form of a professional corporation or association authorized to practice law for a profit, if:
>
> (1) a nonlawyer owns any interest therein, except that a fiduciary representative of the estate of a lawyer may hold the stock or interest of the lawyer for a reasonable time during administration;
>
> (2) a nonlawyer is a corporate director or officer thereof or occupies the position of similar responsibility in any form of association other than a corporation, except as provided by Idaho Code § 30-1513(d); or
>
> (3) a nonlawyer has the right to direct or control the professional judgment of a lawyer.

I.R.P.C. 5.4 (d)(1)–(3).

On appeal, Smith argues once the income is earned, it belongs to him, subject to community property laws, the rights of transmutation, or subsequent gifting or assignment. Under his view, every non-lawyer spouse has an interest in the lawyer-spouse's earned income absent a pre- or post-nuptial agreement. He claims the Bar construed Rule 5.4 too narrowly and such interpretation would regulate his earned income.

At best, Smith's contention is disingenuous. As the bankruptcy court held in dismissing his petition, "[t]hat arrangement whereby he effectively draws a modest salary or draw from his law practice as opposed to benefiting from the full income of that practice under the terms of that agreement was, at best, poor judgment. At worst, unethical." While testifying under oath during

20

the meeting of creditors for his bankruptcy case in November 2018, Smith responded to questions from Assistant U.S. Trustee David Newman:

> NEWMAN: And I believe in the prior meeting of creditors you testified that you do not receive any salary from the law practice?
>
> SMITH: I don't treat it as such. I don't take any funds from the office as such. Vicki would do that for living expenses, operational expenses as is needed. I don't handle the accounting affairs. She does.
>
> NEWMAN: And do you consider that a salary, or a payment to you, or a draw in anyway?
>
> SMITH: I haven't considered it to be a salary to me because I don't take it and I don't take it as a draw. She takes what she takes and then we live off of that, plus my 773, portions of which goes to A and B, so I don't take a draw. There's no check ever written out of the office account to me.

Smith admitted under oath he was not taking income from the LLC. Rather, he was performing legal services, effectively on behalf of Vicki who was "tak[ing] what she takes." Smith's efforts to paint this as a community property issue is simply farcical. Had Smith disposed of his earned income in part or in full outside the LLC after drawing a salary, Rule 5.4 would not have been implicated. But the issue here arises when there is fee sharing. There is a significant risk that the lawyer's professional independence and judgment will be compromised in those cases. Smith argues that the LLC was not formed with an intent to interfere with his professional judgment. While that may have been Smith's conceived purpose, his subjective intent is immaterial to what the facts in the record establish. The Committee's conclusion that Smith was fee sharing with a nonlawyer in indisputable. Whether Smith violated the rationale behind the rule, he admits to violating the rule.

The Certificate of Organization for the LLC filed with the Secretary of State lists Vicki as a "governing officer" for the law firm. Smith also admitted to giving Vicki a 90 percent interest in the law firm while testifying during his disciplinary hearing. While Smith contends he did not share fees with Vicki because the LLC income was "subject to the community property laws" of the marriage, his interpretation conflicts with the irrefutable prohibition in Rule 5.4(d). The rule forbids a lawyer practicing with a professional corporation or association authorized to practice law if a nonlawyer owns *any* interest *or is a corporate director or officer*. Despite his argument that Vicki did not influence his legal judgment, an attorney's obligations under the professional rules apply no matter if the nonlawyer asserts influence over the lawyer's judgment.

The Committee determined Smith practiced law under an LLC in which a non-lawyer owned an interest, violating I.R.P.C. 5.4(d). The Committee also concluded Smith's wife was a 90 percent owner of the firm from January 2016 to March 2019. Smith does not deny Vicki was a 90 percent owner of the LLC. Indeed, this arrangement remained in place until Smith "begrudgingly" changed the structure of the firm during his bankruptcy proceedings, at which time, according to the bankruptcy judge, "the details of the prior arrangement" were scrutinized by the bankruptcy court.

For these reasons, we hold the record shows the Committee's conclusions of law that Smith violated I.R.P.C. 5.4 (a) and 5.4(d) were supported by clear and convincing evidence, were not clearly erroneous, or arbitrary and capricious. We affirm the Committee's conclusions.

## C. The Committee's conclusion that Smith violated I.R.P.C. 8.4(c) and 8.4(d) was not clearly erroneous or arbitrary and capricious.

Under Count Three of the complaint against Smith, the Bar alleged Smith's failure to timely file his 2006–2015 state and federal tax returns was conduct prejudicial to the administration of justice under I.R.P.C. 8.4(d). The Bar also argues that Smith engaged in conduct involving dishonesty, fraud, deceit or misrepresentation in violation of I.R.P.C. 8.4(c).

The Bar points to a series of decisions before other state supreme courts to support the Committee's conclusion that a lawyer's failure to file tax returns is prejudicial to the administration of justice. *See, e.g.*, *Maryland Att'y Grievance Comm'n v. Gore*, 845 A.2 1204, 1214 (Md. 2004) ("willful failure to pay taxes constitutes conduct prejudicial to the administration of justice in violation of Rule 8.4(d)"); *In re Selmer*, 749 N.W.2d 30, 40 (Minn. 2008) (failure to timely file tax returns); *Att'y Grievance Comm'n v. O'Toole*, 843 A.2d 50 (Md. 2004) (attorney's failure to file and pay federal and state income tax returns for three years violated Rule 8.4(d)). Along similar lines, the comments to the Idaho Rules of Professional Conduct likewise identify the failure to pay taxes as conduct prejudicial to the administration of justice. "Many kinds of illegal conduct reflect adversely on fitness to practice law, such as offenses involving fraud and the offense of willful failure to file an income tax return." I.R.P.C. 8.4 cmt 2.

Smith claims he did not willfully fail to file tax returns, but when faced with accruing losses, it was "preferred to avoid the expense of amended returns." Smith argues the delay did not result from a willful refusal to file or pay taxes and that whether he filed is a confidential matter between himself and the taxing authority. The Bar responded that Smith made a calculated decision

not to file any state or federal tax returns from 2006 to 2015 and did not elect to do so until after the disciplinary complaint was filed. The Committee agreed and concluded that this conduct, by a lawyer, was prejudicial to the administration of justice under I.R.P.C. 8.4(d).

Willful failure to file a tax return is addressed under 26 U.S.C.A. Section 7203. To show a violation requires proof: (1) the defendant had to file a return; (2) the defendant failed to file a return; and (3) that the failure to file a return was willful. *United States v. Buckley*, 586 F.2d 498, 503–04 (5th Cir.1978). "Willful" under that statute "generally connotes a voluntary, intentional violation of a known legal duty." *United States v. Pomponio*, 429 U.S. 10, 12 (1976). It requires "proof of a specific intent to do something which the law forbids; more than a showing of careless disregard for the truth is required." *United States v. Hooks*, 848 F.2d 785, 790 (7th Cir.1988).

This Court has examined the meaning of willful in other contexts before, explaining "*Black's Law Dictionary* defines willful as voluntary and intentional, but not necessarily malicious." *Marek v. Hecla, Ltd.*, 161 Idaho 211, 216, 384 P.3d 975, 980 (2016) (internal alterations omitted). In this case, Smith does not dispute his obligation to file taxes. Instead, he contends it was preferrable for him to delay—for eleven straight filing periods. He voluntarily chose to not file, despite acknowledging he had a duty to do so because it would have been costly to amend. These actions, we conclude, were willful.

This conduct follows the same pattern of self-serving behavior in which Smith acts in his own self-serving interest, choosing which rules to follow and which to disregard. Even if filing tax returns and amending those returns would have been costly, the decision not to do so was still a willful decision. The Committee concluded:

> Smith engaged in a pattern of conduct beginning as early as 2006 and continuing through 2020 which has interfered with the administration of justice by failing to timely file federal and state tax returns for the years 2006 through 2015. This conduct continued until the Idaho State Bar filed this Formal Charge proceeding in September of 2020. Although Smith claimed it was impossible to properly report his income due to a variety of excuses, within approximately two months of the filing of this Formal Charge Smith late-filed his federal and state tax returns for the years 2006 through 2015. Smith's failure to timely file federal and state tax returns for the years 2006 through 2015 establishes a pattern of repeated conduct which indicates an indifference to Smith's legal obligations which is prejudicial to the administration of justice and is a violation of IRPC 8.4(d).

We agree with the Committee's reasoning.

23

Attorneys are held to a high standard and are expected to follow the law. They occupy a position of trust, which Smith has obviously violated. The record shows that Smith believes his conduct is not subject to the same standards as his colleagues. In similar circumstances, the rationale of North Dakota's Supreme Court is apropos:

> An attorney is trained at law, has taken an oath, assumes a position of public trust and holds himself out to the public as being fit and capable of handling its funds and problems. *The attorney has assumed a position of responsibility to law itself and any disregard for the law is more serious than a breach by a layman or non-lawyer.* He is an officer of the Court.

*In Disciplinary Action Against Fosaaen*, 234 N.W.2d 867 (N.D.1975) (emphasis added).

The Committee's determination that Smith's failure to file tax returns was prejudicial to the administration of justice is supported by clear and convincing evidence, not clearly erroneous, or arbitrary and capricious. We agree with the rationale of our sister states, as cited above, that holds that an attorney's willful failure to pay taxes constitutes conduct prejudicial to the administration of justice in violation of Rule 8.4(d). Additionally, the Committee's conclusion that Smith engaged in conduct involving dishonesty, fraud, deceit or misrepresentation is also supported by clear and convincing evidence. Despite claiming he delayed filing because of losses from an embezzlement, Smith waited for eleven years *after* the restitution order was entered—and $1,000.00 was recovered. That a taxpayer may intend to file his returns and pay his taxes in the future does not negate his specific intent to violate the law. *See United States v. Ettore*, 387 F. Supp. 582, 586 (E.D. Pa. 1975). Smith delayed filing until the Bar complaint was filed against him, and then glibly testified he considered this as a "no harm, no foul" situation. His actions not only *harm* the esteem to which all members of the Bar must be held, but they are also truly *foul*. They exemplify the deceitful behavior Rule 8.4(c) seeks to prevent. For these reasons, we affirm the Committee's decision.

## D.     Sanctions.

"In reviewing the recommendations of the Committee with regard to sanctions, this Court determines if the sanctions are clearly erroneous or arbitrary and capricious. *Idaho State Bar v. Clark*, 153 Idaho 349, 359-60, 283 P.3d 96, 106-07 (2012). The Committee recommended a two-year suspension and proposed Smith pass the Multistate Professional Responsibility Exam ("MPRE") with a scaled score of 85 or better before being readmitted to practice. However, as the

Bar points out, this Court has discretion over the length of any suspension or other sanction imposed.

"Although the Court places great weight on the findings and recommendations of the hearing committee regarding sanctions, 'it is ultimately the responsibility of this Court to determine the sanctions available' to the ISB." *Idaho State Bar v. Frazier*, 136 Idaho 22, 30, 28 P.3d 363, 371 (2001) (quoting *Idaho State Bar v. Tway*, 128 Idaho 794, 799, 919 P.2d 323, 328 (1996)). "This Court must consider the nature of the violations, mitigating and aggravating circumstances, the need to protect the public, the courts and the legal profession, and the moral fitness of the attorney." *Idaho State Bar v. Souza*, 142 Idaho 502, 506, 129 P.3d 1251, 1255 (2006). Additionally, "[t]here is some benefit in looking at what the Court has done in the past in assessing the appropriate sanction in this case." *Frazier*, 136 Idaho at 30, 28 P.3d at 371. *In Idaho State Bar v. Tway*, 128 Idaho 794, 919 P.2d 323 (1996), Tway violated I.R.P.C. 1.4 (keeping a client reasonably informed), I.R.P.C. 8.4(c) (conduct involving dishonesty, fraud, deceit or misrepresentation) and I.R.P.C. 1.15(a) (safekeeping of client property). Tway had been disciplined for similar conduct before and suspended from the practice of law. *Tway*, 128 Idaho at 799, 919 P.2d at 328. For his second violation, this Court imposed a five-year suspension.

In *Idaho State Bar v. Clark*, 153 Idaho 349, 355, 283 P.3d 96, 102 (2012), Clark violated I.R.P.C. 1.2 (scope of representation), 1.3 (diligence), 1.5(b) (communicating fees), 1.16(d) (declining or terminating service), and 8.4(d) (conduct prejudicial to administration of justice). *Id.* at 355, 283 P.3d at 102. This Court accepted the Committee's recommended sanction, and suspended Clark for three years, with eighteen months withheld. Before being eligible for reinstatement, this Court required Clark to receive approval under I.B.C.R. 304, 305, and 518(b), and pass the MPRE. *Id.* at 360, 283 P.3d at 107. Among other conditions, before Clark could transfer to active status, this Court ordered that he must first be placed on probation for three years. *Id.* If at any time during his probation, he violated any rules of professional conduct, the withheld suspension would be imposed. *Id.*

In this case, Smith has violated I.R.P.C. 1.7(a)(2), 2.1, 5.4(a), 5.4(d), 8.4(c), and 8.4(d). The aggravating factors against Smith are plentiful. As the Committee identified in its Findings of Fact, Conclusions of Law, and Recommendations, Smith has engaged in a "long-standing pattern of conduct involving self-dealing to benefit himself financially[.]". The Committee also found that Smith's conduct "involved dishonesty, fraud, deceit or misrepresentation by acting in his own best

interest while ignoring the fiduciary duty to his mother which has interfered with administration of justice." The violations committed by Smith are substantial and appalling. Even in his appeal before this Court, Smith has shown no contrition or remorse and refuses to accept responsibility for his actions. Instead, he seeks to recast blame, claiming "the only 'prejudicial act' to 'justice' has been Joseph's efforts to undermine and destroy the intentions of [Victoria], defaming and defying her intentions, and once again—stealing from [him]." We view this shocking lack of personal accountability as a highly aggravating circumstance.

Aside from his lack of contrition, Smith has failed to support most of his brief with cogent *legal argument and authority*—a dereliction for which he has repeatedly faced admonition and sanction from this Court. *See, e.g.*, *Elsaesser v. Riverside Farms, Inc.*, 2022 WL 2444697 (2022); *Elsaesser v. Black Diamond*, 2022 WL 2541729 (2022); *Alpha Mortgage Fund II v. Drinkard*, 169 Idaho 446, 497 P.3d 200, 208 (2021) (awarding Rule 11.2 sanctions against Smith personally for "flout[ing] Idaho Appellate Rules and the standard for good faith appeals"); *Sprinkler Irrigation Co., Inc. v. John Deere Ins. Co., Inc.*, 139 Idaho 691, 698, 85 P.3d 667, 674 (2004) (holding sanctions were proper when Smith's brief was "virtually void of any citation to the transcript and record relied upon" and thus "failed to conduct a reasonable inquiry that the appeal be well grounded in fact and warranted by existing law as required" by the appellate rules). Smith has also been cautioned about restating failed arguments and arguing against established law. *See*, *e.g.*, *Smith By and Through Smith v. Treasure Valley Seed Co., LLC*, 164 Idaho 654, 658, 434 P.3d 1260, 1264 (2019) (concluding "Smith's claims are merely a regurgitation of what was argued and ruled upon by this Court previously. His attempts to relitigate this issue are therefore precluded by the 'law of the case' doctrine."); *Smith II*, 164 Idaho at 53, 423 P.3d at 1005 (explaining Smith "has failed to show that the district court incorrectly applied well-established law" and failed to provide any "cogent argument as to why his claims . . . are not clearly barred by res judicata."). As noted, these admonitions and warnings go back to 2004, and have been occurring more and more, most recently. *See Elsaesser* at WL 2444697; *Elsaesser* at WL 2541729.

We must weigh these aggravating factors against the mitigating factors present in the record. First, Smith's violation of I.R.P.C. 1.7 occurred in the context of advising his mother. According to Smith, the relationship between him and his mother was a trusting and loving one. The Committee did not challenge Smith on the nature of the relationship between Victoria and Smith. Second, the Bar concedes that Smith's violation of I.R.P.C. 5.4 did not result from

26

interference by his non-lawyer wife, and there was no evidence Vicki interfered with Smith's professional judgment. Finally, Smith's failure to timely file tax returns in violation of I.R.P.C. 8.4 has not resulted in criminal charges against him.

Nevertheless, the fact that Smith's blatant violation of these rules did not result in any worse outcome or bring about the full consequences the rules are intended to protect against is of little benefit to Smith. Nor does it make his misconduct any less concerning to this Court. Smith's continued refusal to acknowledge he violated any rules or accept any responsibility for his actions, and his steadfast adherence to the narrative that he was merely acting consistent with Victoria's wishes while he shifted her assets for his own benefit, shows he lacks the moral fitness to serve as an attorney in the state of Idaho. Further, Smith's actions in transferring Victoria's property to entities solely under his control without her informed consent, sharing legal fees with his non-lawyer wife, and his willful failure to timely file tax returns for eleven filing periods raise grave concerns over whether he should be permitted to return to the practice of law. Smith has failed to carry his burden to establish the evidence put forth by the Bar does not, at a minimum, support the sanction of suspension of his license to practice law. Our concern, however, is whether the length of that suspension is sufficient given the extent of Smith's misconduct.

Based on our case law, as well as the serious and continuous nature of the ethical violations discussed above, and the recommendation from the Committee, we conclude and will order that Smith be suspended from the practice of law in Idaho for a period of five years. I.B.C.R. 506(c). Two years of his suspension is withheld upon Smith being granted permission to transfer his license from affiliate to active status under the applicable Idaho Bar Commission Rules after three years. Before Smith is eligible for transfer or reinstatement to active practice in Idaho, he must receive approval pursuant to I.B.C.R. 304, 305, and 518(b). Prior to transfer to active status or reinstatement, Smith must also show that he fully complied with the requirements of I.B.C.R. 516 and 517 and that, during the time between the issuance of this Opinion and Smith's reinstatement, he passed the MPRE with a scaled score of at least 85, or its equivalent should there be any changes to the test or its scoring regimen. Smith is also required to reimburse the Bar for the costs associated with this appeal and the underlying proceedings.

Once this opinion is issued, Smith must disengage from the practice of law and representation of any clients. That disengagement must be complete as of the day the remittitur issues. If Smith is currently representing clients, involved in any active litigation, or listed as the

attorney of record on any pending case, he must notify the client and the court of his suspension so that the parties can make arrangements to find new counsel. Failure to comply with this notice requirement and disengage with representation, as well as commencing any new legal proceeding as an attorney after the date of remittitur, until reinstated, will result in the imposition of the full five-year suspension. The unauthorized practice of law is prohibited by statute in Idaho, and any person who is not duly admitted and licensed to practice may face a fine of $500 or jail for up to six months. I.C. § 3-420. We strongly caution Smith to adhere to the restrictions imposed in this opinion so as not to face criminal repercussions in addition to the civil sanctions and consequences already imposed.

Upon reinstatement to active status, Smith will be placed on probation for two years upon these terms and conditions: (1) If Smith is found to have violated any Idaho Rule of Professional Conduct for which a sanction is imposed for any conduct that occurred between the date of Smith's suspension through the period of his probation, then the withheld suspension will be immediately imposed; (2) Smith must also make arrangements for a supervising attorney, approved by the Bar, to supervise Smith during his probation. This attorney will not assume personal responsibility for handling Smith's cases, but Smith must meet with this supervising attorney monthly during the duration of his probation to ensure Smith is complying with all rules of professional conduct, including conducting conflict checks on any client he represents and, if necessary, obtaining a signed writing from clients he represents with their informed consent of potential conflicts of interest.

Finally, while the Bar did not request attorney fees on appeal, we nonetheless conclude the Bar prevailed in this appeal and is entitled to reasonable attorney fees. "[T]his Court may consider, sua sponte, whether a party has brought an appeal for any improper purpose, and if so, award reasonable attorney fees to the other party." *Jim & Maryann Plane Family Tr. v. Skinner*, 157 Idaho 927, 342 P.3d 639, 648 (2015) (quoting *Bettwieser v. New York Irrigation Dist.*, 154 Idaho 317, 330, 297 P.3d 1134, 1147 (2013). Idaho Appellate Rule 11.2, in part, explains:

> The signature of an attorney or party constitutes a certificate that the attorney or party has read the notice of appeal, petition, motion, brief or other document; that to the best of the signer's knowledge, information, and belief after reasonable inquiry it is well-grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. If the notice of appeal, petition,

motion, brief, or other document is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the notice of appeal, petition, motion, brief or other document including a reasonable attorney's fee.

"[A]ttorney fees can be awarded as sanctions when a party or attorney violates either (a) the frivolous filings clause, or (b) the improper purpose clause." *Sims v. Jacobson*, 157 Idaho 980, ___, 342 P.3d 907, 914 (2015). We find that the Smith advanced arguments that were both frivolous and lacked a proper purpose. Therefore, we award the Bar attorney fees on appeal pursuant to I.A.R. 11.2.

## VI. CONCLUSION

The Committee's decisions regarding I.R.P.C. 1.7(a)(2), 2.1, 5.4(a), 5.4(d), 8.4(c), and 8.4(d) are supported by clear and convincing evidence, and are not clearly erroneous, or arbitrary and capricious. This Court affirms the Committee's Findings of Fact, and Conclusions of Law. The Court modifies the Bar's Recommendations as to the appropriate sanction as set forth above. Costs and attorney fees are awarded to the Bar.

Justices BRODY, STEGNER, MOELLER, and ZAHN **CONCUR**.